**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **TRANSCANADA PIPELINES LTD.** | * | |
| | * | |
| Appellant | * | |
| | * | |
| v. | * | Civil No. **PJM 10-1464** |
| | * | |
| **USGEN NEW ENGLAND, INC.** | * | |
| | * | |
| Appellee | * | |

**OPINION**

TransCanada Pipelines Ltd. ("TransCanada") has appealed a decision of the United States Bankruptcy Court, rendered following a nine-day bench trial, issued in *In re USGen New England, Inc. ("USGen"), Reorganized Debtor*, Case No. 03-30465 (Bankr. Md.). USGen has cross-appealed. The Court has jurisdiction over the parties' appeals pursuant to 28 U.S.C. § 158(a). For the following reasons, the Court **AFFIRMS** the decision of the Bankruptcy Court in its entirety.

**I.**

The facts of the case are set out in great detail in the Bankruptcy Court's opinion of April 1, 2010. *See In re USGen New England, Inc., Reorganized Debtor*, 429 B.R. 437 (Bankr. Md. 2010). Rather than engaging in a similarly exhaustive recitation here, the Court will relate only those facts it considers critical to the disposition of this appeal. The Court will begin with a synopsis of the undisputed and disputed facts, summarize the findings of the Bankruptcy Court that have been challenged on appeal, then address the Bankruptcy Court's ultimate conclusions.

**A.**

The undisputed facts are these:

TransCanada is a Calgary, Alberta-based company engaged in the natural gas pipeline business. Among other activities, it owns and operates the Canadian Mainline pipeline (the "Mainline"), a 14,898-kilometer natural gas transmission system that extends from the Alberta-Saskatchewan border in the west to the Quebec-Vermont border in the east, where it connects with other natural gas pipelines in Canada and the United States. The Mainline transports natural gas from west to east using a series of compressors installed at various points along its path. TransCanada contracts with customers, known as "shippers," who provide natural gas for TransCanada to transport at specified receipt points; TransCanada then delivers the gas in the amounts provided at delivery points designated by contract. Generally speaking, a shipper pays a charge, known as a demand toll, for the right to ship gas up to a maximum amount specified in its contract with TransCanada. The toll is based primarily on the distance between the receipt point and the delivery point, multiplied by a contracted-for quantity of gas measured in gigajoules per day ("GJ/d").[1] Whenever a shipper actually ships natural gas—i.e., when it "nominates" its contracted-for use—it pays an additional charge based on the quantity of natural gas shipped, which is also measured in GJ/d.[2]

TransCanada sells most of its capacity on the Mainline through an auction process known as an "existing capacity open season." By posting an existing capacity open season notice, TransCanada announces to potential shippers the amount of capacity available along a particular segment of the Mainline and specifies the date by which bids for that capacity must be received.

---

[1] A joule is a unit of energy equal to the work performed by a force of one newton (a small unit of force) acting through a distance of one meter. A gigajoule represents one billion joules. The quantity of natural gas consumed each year in a typical Canadian home is roughly 120 gigajoules. *See* Government of Alberta, Energy Measurements, http://www.energy.alberta.ca/About_Us/1132.asp (last visited Aug. 25, 2011).

[2] The Bankruptcy Court dedicated a portion of its opinion to explaining the distinctions between two different forms of gas transportation service—namely, "Firm Transportation" service ("FT") and "Short-Term Firm Transportation" service ("STFT"). *See USGen*, 429 B.R. at 444-45. Because those distinctions are not critical to the resolution of this appeal, the Court will not discuss them here.

At the close of an existing capacity open season, TransCanada ranks the bids submitted and awards posted capacity in accordance with procedures outlined in its Transportation Access Procedure (the "TAP"). The bid-ranking procedures are designed to maximize TransCanada's revenue over the long term and ensure that capacity is awarded to the shippers that desire it the most.

Most of TransCanada's operations, including operation of the Mainline, are regulated by the National Energy Board of Canada (the "NEB"). Among other things, the NEB: (1) reviews and approves, for each calendar year, the tolls that TransCanada will charge its shippers for the transport of natural gas along the Mainline;[3] (2) imposes upon TransCanada a "duty of prudence" that requires it to make every effort to minimize its tolls and recover unmitigated damages from defaulting shippers;[4] and (3) approves the bid-ranking procedures outlined in the TAP.

Pursuant to this regulatory scheme, TransCanada may not ordinarily sell capacity on the Mainline unless it first posts the capacity for sale during an existing capacity open season. However, if TransCanada determines that projected future demand for its pipeline services necessitates an expansion of its long-term capacity on the Mainline, and if it intends to submit to the NEB an application for authorization to construct new facilities or otherwise expand its capacity, it must issue notice of a "new capacity open season." When TransCanada announces a

_____

[3] Stated in simple terms, TransCanada's tolls are calculated as follows: First, to TransCanada's prudently incurred costs is added an amount representing a reasonable rate of return for its investors; the sum of these two figures constitutes TransCanada's annual revenue requirement. Second, TransCanada's revenue requirement is divided by its "allocation units," which represent the known GJ/d shipping units in TransCanada's contracts at the time of NEB approval of its annual tolls; from this calculation, tolls for all receipt and delivery points on the Mainline are derived for the upcoming year. Tolls on the Mainline are primarily distance-based, meaning that the longer the haul along the Mainline, the higher the toll. As the Bankruptcy Court noted, changes in allocation units will affect toll amounts. For example, removal of a contract breached by a shipper will have the effect of changing the average unit cost along the Mainline and, all other things being equal, all tolls will rise (subject to regulatory approval). *USGen*, 429 B.R. at 446.

[4] TransCanada is not permitted to automatically pass the costs of a breached contract on to its other shippers. Instead, it must calculate the effects of any such breach in its annual toll application, which must then be reviewed and approved by the NEB.

new capacity open season, it informs potential shippers that additional capacity will be available for sale beginning on some specified future date and announces the time period during which bids for the new capacity will be accepted. Pursuant to NEB-approved procedures, shippers applying for new capacity service must submit certain documentation with their bids showing, among other things, evidence of their need for gas transport services during the timeframes contemplated in their bids.

Although expansion of capacity via the construction of new facilities requires NEB approval, TransCanada may, *without* regulatory approval, temporarily increase capacity on the Mainline through a mechanical alteration process known as "re-aeroing." As noted *supra*, the Mainline transports natural gas from west to east using a series of compressors installed at various points along its path. TransCanada may "re-aero"—i.e., mechanically alter—any one of these compressors either to: (1) increase pipeline efficiency and operational flexibility, with a resulting reduction in pipeline capacity; or (2) increase pipeline capacity, but with a resulting reduction in pipeline efficiency and operational flexibility.[5] Although the cost and effort incurred in the re-aeroing of a compressor will vary depending upon the circumstances, the process can, under favorable conditions, take as little as three to four days to complete.

USGen was a Bethesda, Maryland-based energy company that owned electricity-generating facilities in New England and bought and sold electricity and energy-related products. Beginning in 1992, USGen entered into a contract with TransCanada, whereby USGen reserved

---

[5] The Bankruptcy Court further described the re-aeroing process as follows:

> TransCanada [re-aeros] by reconfiguring certain compressors from 'parallel' to 'series' or vice versa. When the compressor station is arranged in parallel, the fuel efficiency of the compressor is increased, along with operating flexibility, but throughput or capacity is decreased. When a compressor operates in series mode, efficiency and flexibility decrease while throughput is increased.

*USGen*, 429 B.R. at 450.

53,904 GJ/d of capacity on the Mainline from a receipt point at Empress, Alberta to a delivery point near Waddington, New York (the "Empress to Iroquois path"). The contract, which was to run from early 1992 through October 31, 2006, obligated USGen to pay demand tolls reflecting the cost of transporting gas from Empress to Iroquois, as well as a commodity charge whenever it actually shipped gas. The contract is governed by Canadian law.

On July 8, 2003 (the "petition date"), USGen filed a voluntary petition in the Bankruptcy Court of this District, seeking relief under Chapter 11 of the Bankruptcy Code.[6] Shortly thereafter, on August 12, 2003, USGen asked the Bankruptcy Court to reject its contract with TransCanada, pursuant to 11 U.S.C. § 365. On September 12, 2003, the Bankruptcy Court granted USGen's request and authorized rejection of the contract effective September 5, 2003. The following month, TransCanada filed a proof of claim in the Bankruptcy Court, seeking $71,133,275.63 in rejection damages, which it later reduced to $52,426,566.[7]

At the time the USGen contract was rejected, TransCanada was in the middle of a "combined open season," so called because it was both an existing capacity open season *and* a new capacity open season. Prior to the rejection of the USGen contract, TransCanada had posted the availability of 100,000 GJ/d of capacity on the Empress to Iroquois path. On September 15, 2003, three days after the Bankruptcy Court authorized rejection of the USGen contract and three days before the combined open season was scheduled to end, TransCanada amended its open season notice to announce an increase in available capacity on the Empress to Iroquois path of 50,000 GJ/d, resulting in 150,000 GJ/d of total available capacity. The purpose of the

---

[6] Pursuant to the plan of liquidation approved by the Bankruptcy Court in May 2005, all of USGen's unsecured creditors are to be paid in full, with interest. *USGen*, 429 B.R. at 451. In other words, USGen is "a solvent bankruptcy estate." *Id.* at 490-91.

[7] Except where otherwise noted, all currency figures in this Opinion are expressed in Canadian dollars.

amendment was to include the 53,904 GJ/d—rounded to 50,000 GJ/d—of capacity "turned back" by USGen as a result of the contract rejection (the "turnback capacity"). Six days after the combined open season ended, TransCanada issued a notice declaring, "TransCanada Open Season a Success." That notice read, in part: "Given market interest in the open season, we are pleased to share some of the preliminary results. Although specific details cannot be revealed until final contracts are signed, there was considerable interest expressed for space on the Mainline, and in some areas, available capacity was oversubscribed." Bankr. R., TransCanada Ex. 114K, at 1.

Pursuant to the bid-ranking methodology outlined in the TAP,[8] TransCanada ranked the various bids submitted during the combined open season and awarded contracts to four different shippers, including Gaz Metropolitan ("Gaz Metro") and Nexen Marketing ("Nexen"), as set forth in the following chart:[9]

---

[8] Pursuant to the TAP, bids are ranked from the most to the least valuable, based upon the mathematical product of: "(1) the amount of the demand toll measured in dollars per month (which turns largely on the distance between receipt and delivery points); and (2) the duration of the contract (measured in months)." *USGen*, 429 B.R. at 448. Thus, a contract producing a very large revenue bump in the short term may be ranked lower than one that, while producing less revenue per month, extends for a longer period of time and ultimately provides more revenue over the long term.

[9] In explanation of the chart: Generally speaking, "Rank" represents the projected value of a bid relative to other bids. The higher the rank, the more valuable the bid is considered on a per gigajoule basis. "Volume" represents the capacity, in GJ/d, requested in each shipper's bid. "Demand Toll" represents the amount TransCanada will charge for the capacity each month, expressed in Canadian dollars per gigajoule. The demand toll is primarily a function of distance along the Mainline, meaning that, the longer the distance requested in the bid, the higher the demand toll. *See* Bankr. R., Trial Tr. 746:16-747:11, Mar. 5, 2008 (testimony of Peter Milne). "Duration" represents the duration of the contract requested in the bid, expressed in months. Finally, "Evaluation," a dollar figure calculated by multiplying the demand toll by the duration, effectively represents the price charged for one gigajoule over the entire life of the contract. This figure, which TransCanada uses to rank bids, does not account for volume. Volume, or capacity requested, plays no role in the bid-ranking process, so as to prevent larger shippers from dominating the Mainline over smaller shippers. *See id.* at Trial Tr. 809:3-814:18, Mar. 5, 2008 (testimony of Peter Milne).

To illustrate: The St. Lawrence Gas bid, which had a monthly demand toll of $35.73 per gigajoule (rounded to the nearest penny) and a duration of 60 months, resulted in an evaluation of $2,143.77 per gigajoule over the duration of the contract, which is the product of $35.73 (before rounding) and 60. Primarily due to its high demand toll, the St. Lawrence Gas bid outranked all others, despite the fact that the volume it requested (3,400 GJ/d) was comparatively small.

| Rank | Shipper | Volume (GJ/d) | Demand Toll (Monthly $ per GJ) | Duration (Months) | Evaluation (Toll x Duration) |
|---|---|---|---|---|---|
| 1 | St. Lawrence Gas | 3,400 | $35.73 | 60 | $ 2,143.77 |
| 2 | Gaz Metro | 40,000 | $10.53 | 120 | $ 1,263.47 |
| 3 | Gaz Metro | 20,000 | $8.33 | 120 | $ 999.60 |
| 4 | NJR Energy Services | 40,000 | $8.53 | 89 | $ 758.82 |
| 5 | Nexen | 2,500 | $34.51 | 17 | $ 586.68 |
| 6 | Nexen | 12,500 | $32.80 | 17 | $ 557.58 |

Because, following these awards, TransCanada still had capacity available on the Empress to Iroquois path, it subsequently initiated a "daily open season,"[10] during which it offered for sale an additional 38,800 GJ/d of capacity. On the first day of the daily open season, Nexen purchased all 38,800 GJ/d posted from Empress to Iroquois. The next day, October 16, 2003, TransCanada issued a notice that read: "The daily open season closed at 3:00 p.m. Calgary time and *one of the system segments, Empress to Iroquois, sold out!* . . . Because one of the system segments sold out yesterday, TransCanada will now close the daily open season process and hold another existing capacity open season." Bankr. R., TransCanada Ex. 114M, at 1 (emphasis added).

On October 20, 2003, TransCanada issued notice of another existing capacity open season, which included the posting of an additional 38,800 GJ/d of capacity along the Empress to Iroquois path. However, just three days later, on October 23, 2003, TransCanada realized that it had miscalculated the remaining available capacity from Empress to Iroquois and that, in fact, no such capacity remained. Accordingly, it amended its open season notice to show zero available capacity from Empress to Iroquois. It also issued the following message: "TransCanada is revising this open season for firm capacity. Upon further assessment and analysis, it has been

---

[10] If posted capacity remains after an existing capacity open season, TransCanada may offer a portion of the remaining capacity in a "daily open season," which typically begins at 11:00 a.m. and closes at 4:00 p.m. on a normal business day. At the close of a daily open season, TransCanada ranks and awards bids in accordance with the same TAP procedures employed during an existing capacity open season.

concluded that there is no more capacity available to Iroquois. The posted capacity from Empress to Iroquois has been amended to zero. We apologize for any inconvenience this may have caused." Bankr. R., TransCanada Ex. 114O, at 1.

From November 2003 through October 2006, when TransCanada's contract with USGen would have expired, TransCanada issued numerous open season notices, none of which offered existing capacity from Empress to Iroquois. In December 2003, however, TransCanada initiated a new capacity open season, which offered new capacity to commence on November 1 in each of the three years 2004, 2005, and 2006. In February 2004, it issued another new capacity open season offering new capacity on the Empress to Iroquois path. TransCanada originally planned to furnish all the new capacity awarded by accelerating construction of new pipe, or "loop" (the "Stittsville loop"), near a compressor located in Stittsville, Ontario (the "Stittsville compressor"). However, after it became apparent that it could satisfy the earliest of these new capacity contracts at lower cost by re-aeroing rather than by accelerating completion of the Stittsville loop, TransCanada abandoned its accelerated construction plans and re-aeroed the Stittsville compressor instead. The most significant portions of the re-aeroing effort, which TransCanada completed on October 20, 2004, took approximately six days to complete and cost $135,000.

**B.**

The disputed facts relate to the question of whether, and to what extent, USGen is entitled to mitigation credit for contracts TransCanada entered into with other shippers after the Bankruptcy Court authorized rejection of the contract between TransCanada and USGen.

According to TransCanada, any contracts consummated after rejection of the USGen contract do not constitute mitigation because, absent USGen's breach, TransCanada could have

serviced both those additional contracts *and* USGen's contract. Accordingly, on appeal, TransCanada challenges several of the Bankruptcy Court's findings:

First, the Bankruptcy Court found that there was "surging demand" for capacity on the eastern end of the Mainline and in the U.S. northeast in late 2003 and early 2004, such that, if TransCanada had offered additional available capacity for sale during that time period, it would have sold it. In support of this finding, the Bankruptcy Court noted, among other things, that: (a) TransCanada quickly sold the capacity it offered for sale on the Empress to Iroquois path, including the USGen turnback capacity, in the September 2003 combined open season and the October 2003 daily open season; (b) during the October 2003 daily open season, Nexen purchased all 38,800 GJ/d of capacity on the Empress to Iroquois path *on the same day that it was posted*; (c) in February 2004, TransCanada posted and successfully sold 100,000 GJ/d of new capacity on the Empress to Iroquois path; (d) TransCanada's own notices to shippers indicated that there was "considerable interest expressed for space on the Mainline" in September 2003, Bankr. R., TransCanada Ex. 114K, at 1, and that the capacity offered on the Empress to Iroquois path during the October 2003 daily open season had "sold out," *id.* at TransCanada Ex. 114M, at 1; (e) in September 2003, Craig Few, TransCanada's Vice President—Gas Transmission East, stated in a notice to shippers that "[t]here is no question that we are connected to strong and growing markets in eastern Canada and the U.S. northeast, which we anticipate will drive requirements for additional capacity," *id.* at TransCanada Ex. 114K, at 1; and (f) a TransCanada witness testified at trial that, in late 2003, TransCanada was "seeing increased demand for capacity [on] the eastern end of its system," *id.* at Trial Tr. 1648:18-1649:1, Mar. 10, 2008 (testimony of Thomas Robinson).[11]

---

[11] As will be discussed in further detail *infra*, TransCanada contests the Bankruptcy Court's finding that there was "surging demand" along the eastern end of the Mainline in late 2003 and early 2004.

Second, the Bankruptcy Court found that: (a) the September 2003 and October 2003 Nexen contracts represented the last capacity sold on the Empress to Iroquois path in late 2003; (b) TransCanada could not have entered into those contracts absent the USGen turnback capacity; and (c) the Nexen contracts should therefore be considered mitigation of the damages resulting from USGen's breach of its contract with TransCanada.[12] The Bankruptcy Court arrived at these findings after applying TransCanada's bid-ranking procedures and determining that, of the contracts awarded in late 2003, the Nexen contracts were the least valuable to TransCanada and thus represented—pursuant to procedures outlined in the TAP—the last awarded on the Empress to Iroquois path during that time period.

Third, the Bankruptcy Court rejected TransCanada's factual assertion that, absent USGen's breach, it could have satisfied both the USGen contract *and* the Nexen contracts by re-aeroing the Stittsville compressor and thereby increasing capacity on the Mainline. The Bankruptcy Court rejected TransCanada's re-aeroing theory because: (a) TransCanada's assertion that it could have re-aeroed the Stittsville compressor was not credible since, despite surging demand in late 2003 and early 2004, it did not in fact pursue re-aeroing during that time period;[13] (b) TransCanada could not have sold additional capacity theoretically available through

---

[12] In making this finding, the Bankruptcy Court necessarily found that TransCanada in fact resold the USGen turnback capacity. This finding is bolstered by an e-mail written by one of TransCanada's own employees, which stated: "I thought I'd point out that USGen New England is no longer a shipper on the system. They went belly-up and their capacity came back to us, and we then resold it in an open season." Bankr. R., USGen Ex. 67.

[13] On this point, the Bankruptcy Court wrote:

> [TransCanada] did not decide to issue a new open season notice offering the capacity that was hypothetically available through re-aeroing. TransCanada did not do so despite robust bidding in the July-September 2003 open season and the October 2003 daily open season. As a factual matter, the Court rejects TransCanada's contention that it 'would have' re-aeroed Stittsville in order to accommodate the Nexen contracts in the absence of the USGen turnback capacity. When faced with the opportunity to take that very action at the time of the contract rejection and the sale of the USGen turnback capacity, as a matter of fact, TransCanada did not choose to offer for sale the capacity that was hypothetically available through re-aeroing.

re-aeroing because it did not post such capacity for sale in the fall of 2003;[14] and (c) assuming, contrary to the Bankruptcy Court's other findings, that TransCanada "could have" and "would have" re-aeroed the Stittsville compressor in late 2003, its failure to post such capacity for sale would have constituted a failure to fulfill its duty to mitigate the damages resulting from USGen's breach.

Fourth, the Bankruptcy Court rejected TransCanada's assertion that it could have treated Gaz Metro's bids as bids for new capacity (as opposed to existing capacity), thus freeing up the 60,000 GJ/d allocated to Gaz Metro and permitting TransCanada to service the Nexen contracts even without the USGen turnback capacity. The Bankruptcy Court based its rejection of this theory on, among other evidence, the testimony of USGen's expert, who opined that the Gaz Metro bids constituted bids for existing—as opposed to new—capacity, *see* Bankr. R., Trial Tr. 1002:2-9, Mar. 6, 2008 (testimony of Peter Milne), and also on one of TransCanada's own documents, which suggested that there was but a single bid for new capacity during the September 2003 combined open season, and that that bid plainly was not one of the Gaz Metro bids, *see* Bankr. R., TransCanada Ex. 43, at 2-3. The Bankruptcy Court noted that no witness testified that the Gaz Metro bids included the requisite new capacity documentation or that they otherwise qualified as bids for new capacity. Ultimately, the Bankruptcy Court concluded that "the Gaz Metro bids did not qualify as bids for new capacity and that TransCanada could not have treated the Gaz Metro bids as bids for new capacity in the July-September 2003 open season." *USGen*, 429 B.R. at 487.

---

*USGen*, 429 B.R. at 481. As noted *supra*, TransCanada did eventually re-aero the Stittsville compressor, completing the process in October 2004.

[14] As noted *supra*, TransCanada's regulatory system prohibits it from selling capacity on the Mainline unless it first posts the capacity for sale in an open season.

Fifth, and finally, the Bankruptcy Court rejected as factually unsupportable TransCanada's assertion that, if USGen is entitled to any mitigation credit at all, its credit should be limited to an amount reflecting only a very short distance along the Mainline. As noted *supra*, the Mainline is some 14,898 kilometers in length and runs from Empress, Alberta in the west to the Quebec-Vermont border in the east, where it connects with other natural gas pipelines in Canada and the United States. According to TransCanada, it had, both at the time of USGen's breach and throughout the remainder of the term of its contract with USGen, substantial excess capacity in the western segments of the Mainline—from Empress in the far west to the so-called "Triangle," a loop of interconnecting pipe near the eastern end of the Mainline that includes the Stittsville compressor and Iroquois. TransCanada further claims that the "bottleneck" on the Mainline occurred near the Stittsville compressor, which is only a short distance from the end of the Empress to Iroquois path, and that—because tolls on the Mainline are primarily distance-based—USGen should receive mitigation credit, if at all, only for the amount of the Nexen contracts attributable to the short distance along the far eastern end of the Mainline. The Bankruptcy Court, however, rejected this assertion, concluding that "[n]othing in the record supports the notion that Nexen Marketing would have accepted a contract in September or October 2003 only from Empress to [the Triangle]. Indeed, the record establishes that such a notion is factually unsupportable." *USGen*, 429 B.R. at 487. Specifically, the Bankruptcy Court found no plausible evidence in the record suggesting that Nexen would have accepted a contract for delivery at any point short of its contracted-for delivery point east of Iroquois. The Bankruptcy Court further noted that, were it to adopt TransCanada's partial mitigation theory, TransCanada would, contrary to Canadian law, end up in a better position than it would have been in absent USGen's breach, since it would receive the full value of its contract with USGen

*and* all but a small portion of certain contracts (the Nexen contracts) it could not have obtained

absent the breach. For these reasons, the Bankruptcy Court concluded that TransCanada's partial

mitigation theory had no basis in the evidence or in Canadian contract law.

## C.

After making the factual findings outlined above and applying relevant law, the

Bankruptcy Court concluded that: (1) USGen was entitled to mitigation credit for the combined

value of the September 2003 and October 2003 Nexen contracts; (2) the value of TransCanada's

claim should be discounted to the petition date; (3) TransCanada's claim should be converted to

U.S. dollars as of the petition date;[15] and (4) despite USGen's argument to the contrary, the

Canadian Supreme Court's decision in *British Columbia v. Canadian Forest Products Ltd.*,

[2004] 2 S.C.R. 74 (Can.), did not bar TransCanada's recovery.

This appeal followed.

## II.

On appeal, TransCanada argues that: (1) USGen is not entitled to any mitigation credit;

(2) the Bankruptcy Court erroneously applied the Canadian legal standard for mitigation and, in

so doing, improperly shifted the burden of proof from USGen to TransCanada; (3) the factual

findings supporting the Bankruptcy Court's conclusion that TransCanada could not have

serviced the Nexen contracts absent USGen's breach were clearly erroneous;[16] (4) even if

---

[15] The Bankruptcy Court found that the value of TransCanada's claim, prior to the application of any mitigation credit, was $65,068,045. *USGen*, 429 B.R. at 463. Later, by order dated April 19, 2010, the Bankruptcy Court concluded that the value of TransCanada's claim, *after* application of USGen's mitigation credit and discounting to the petition date, was $4,643,700. *See* Bankr. Order of Apr. 19, 2010, Case No. 03-30465 [Bankr. Paper No. 2388]. The Bankruptcy Court then converted the claim to U.S. dollars as of the petition date ($3,389,067) and awarded TransCanada the converted amount. *Id.*

[16] These findings relate to: surging demand on the eastern end of the Mainline and in the U.S. northeast in late 2003 and early 2004; the use of TransCanada's bid-ranking procedures to determine which contracts were the last awarded in late 2003; the rejection of TransCanada's re-aeroing theory; and the rejection of TransCanada's assertion that it could have treated the Gaz Metro bids as bids for new capacity.

USGen is entitled to mitigation credit, that credit must be limited to the amount of the Nexen contracts attributable to the short distance along the bottleneck at the far eastern end of the Mainline; (5) the Bankruptcy Court erred in discounting the value of TransCanada's claim to the petition date; and (6) the Bankruptcy Court erred in converting TransCanada's claim to U.S. dollars as of the petition date.

USGen argues that the Bankruptcy Court's decision should be affirmed in all respects, save one. According to USGen, TransCanada is not entitled to any damages at all—not even the $4,643,700 that the Bankruptcy Court ultimately awarded—because TransCanada's regulatory system fully insulated it from the consequences of USGen's breach. Thus, USGen asks the Court to reverse the Bankruptcy Court and deny TransCanada's claim in its entirety.

### III.

A district court reviews conclusions of law made by a bankruptcy court *de novo*. *See Cypher Chiropractic Ctr. v. Runski*, 102 F.3d 744, 745 (4th Cir. 1996). The bankruptcy court's findings of fact, however, "shall not be set aside unless clearly erroneous." Fed. R. Bankr. P. 8013; *see also In re Bryson Props., XVIII*, 961 F.2d 496, 499 (4th Cir. 1992). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Bessemer City*, 470 U.S. at 573. Indeed, the "reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the [fact-finding] role of the lower court." *Id.*

A bankruptcy court's determination of foreign law is a conclusion of law and is therefore subject to *de novo* review. *See In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 565 n.28 (E.D. Va. 2010) (stating that foreign law determinations by bankruptcy courts are treated as questions of law requiring *de novo* review); *see also* Fed. R. Bankr. P. 9017 (stating that Federal Rule of Civil Procedure 44.1 applies in bankruptcy proceedings); Fed. R. Civ. P. 44.1 (stating that a court's determination of foreign law "must be treated as a ruling on a question of law"). When determining foreign law, a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Faggionato v. Lerner*, 500 F. Supp. 2d 237, 244 (S.D.N.Y. 2007) ("In acting under Rule 44.1, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities.").

## IV.

The Court considers the various arguments advanced by TransCanada.

## A.

The crucial issue in this case is whether, and to what extent, USGen is entitled to mitigation credit for contracts TransCanada entered into with other shippers after the Bankruptcy Court authorized rejection of the contract between TransCanada and USGen. Because the parties agree that their contract is governed by Canadian law, resolution of this issue requires consideration of Canadian mitigation rules.

Under Canadian law, a non-breaching party has a duty to "take reasonable steps to mitigate its loss." *British Columbia v. Canadian Forest Prods. Ltd.*, [2004] 2 S.C.R. 74, ¶ 106

(Can.). Thus, "[w]hen mitigation yields a sum of money equal to or greater than the original loss, the plaintiff has made himself whole, and cannot claim further from the defendant." *Id.*

To determine whether a non-breaching party has mitigated its loss by entering into a contract with a third party, Canadian law applies a "could have" test, meaning that, if the non-breaching party "could have" entered into the third-party contract even without the breach, then the third-party contract does not constitute mitigation reducing the amount owed. If, on the other hand, the non-breaching party could *not* have entered into the third-party contract absent the breach, then the third-party contract serves to reduce the amount of the breaching party's liability. The Supreme Court of Canada has articulated the standard thus:

> The rule, in such a case, governing mitigation is not in dispute. If the interest acquired by the damaged person is something he could not have been able to obtain if the contract had been carried out, it must be brought into the account; if it *could have* been acquired consistently with his performance of the contract, it is not available as mitigation.

*Dawson v. Helicopter Exploration Co. Ltd.*, [1958] 12 D.L.R. (2d) 1, 10 (Can.) (emphasis added); *see also Canadian Forest Prods.*, [2004] 2 S.C.R. 74, ¶ 107 ("[If] the plaintiff could, even in the absence of the wrong, have made the disputed profit[,] . . . it is treated as collateral. If not, it goes to reduce the plaintiff's loss." (quoting S. M. Waddams, The Law of Damages ¶ 15.800 (4th ed. 2004))).

In the present case, the parties agree that the "could have" test governs the determination of whether, and the extent to which, USGen is entitled to mitigation credit for contracts TransCanada entered into with other shippers—namely, the Nexen contracts—after rejection of its contract with USGen. They also generally agree that USGen—not TransCanada—has the burden of proving mitigation. *See Michaels v. Red Deer College*, [1975] 2 S.C.R. 324, ¶ 11

(Can.) (noting that the defendant holds the burden on mitigation).[17] The parties' views diverge considerably, however, with respect to the precise operation of the burden of proof—specifically, the extent to which, if at all, USGen must show that TransCanada could not have taken certain hypothetical actions that would have allowed it to enter into and perform the Nexen contracts even without the USGen turnback capacity.

In TransCanada's view, USGen must prove not only that TransCanada sold the USGen turnback capacity and thereafter had no additional capacity available for sale; USGen must also show that TransCanada could not—under virtually any circumstances—have entered into the Nexen contracts absent USGen's breach. For instance, according to TransCanada, USGen must prove that TransCanada could not have taken certain hypothetical actions—such as re-aeroing the Stittsville compressor in late 2003 or early 2004, or treating the Gaz Metro bids as bids for new capacity—that might have enabled it to service these contracts absent the breach. TransCanada maintains that the Bankruptcy Court misapplied the mitigation standard and, in so doing, improperly shifted the burden of proof from USGen to TransCanada.[18]

USGen's take as to the burden of proof is markedly different. Although it concedes that it has the burden of proving mitigation, it maintains that it met that burden by establishing that TransCanada in fact sold the USGen turnback capacity in the fall of 2003, and that TransCanada thereafter had no remaining capacity available for sale. Beyond that, says USGen, the burden of demonstrating that TransCanada could have taken certain hypothetical actions enabling it to service additional contracts absent USGen's breach would rest solely with TransCanada.

---

[17] Because the parties agreed prior to trial that USGen had the burden of proof on mitigation, the Bankruptcy Court proceedings were conducted with USGen in the role of plaintiff and TransCanada in the role of defendant.

[18] It is worth noting that, in American law, the term "burden of proof" is understood to encompass two distinct burdens: the burden of persuasion and the burden of production. *See, e.g.*, *Schaffer v. Weast*, 546 U.S. 49, 56 (2005). This distinction is discussed further in footnote 20, *infra*.

On this point, the Bankruptcy Court sided with USGen. Because neither party cited a case explicitly addressing whether a breaching party must disprove alternatives hypothetically available to the non-breaching party, the Bankruptcy Court relied in part on a widely-cited Canadian treatise on damages by Professor Stephen Waddams, a law professor at the University of Toronto. *See* S. M. Waddams, The Law of Damages (4th ed. 2004) (the "Waddams treatise").[19] The Bankruptcy Court cited a passage from the Waddams treatise that went directly to the issue:

> A . . . question arises where a seller, on the buyer's default, although reselling the particular goods at the contract price, claims the profits lost on one transaction. If the defendant's argument is characterized as one based on mitigation, that is, that the seller has mitigated the loss by reselling, it might seem that the buyer would bear the onus of proving that the seller had fully mitigated the loss. But this would require the buyer to prove that the seller had inadequate stocks of identical goods to supply both customers and *as the critical facts in such a dispute are peculiarly within the knowledge of the seller, it would seem that the seller could reasonably be expected to adduce the necessary evidence.* Alternatively, it might be said that, though the defendant bears the onus of proving mitigation, the onus is discharged by showing that the plaintiff has sold the goods at the contract price unless the plaintiff can show that, after all, there is a loss of profit. Where the Sale of Goods Act applies, it seems that the onus will be on the plaintiff to establish a loss of profits for, by what is said to be the *prima facie* measure of damages, the plaintiff will have suffered no loss. The same conclusion seems desirable in cases such as sales of shares or rental of equipment or apartments where the Act does not apply.

Waddams, *supra*, at ¶ 13.120 (emphasis added). Thus, viewed in the context of the Canadian "could have" test described *supra*, *see Dawson*, [1958] 12 D.L.R. (2d) at 10, the mitigation standard articulated by the Waddams treatise essentially comes to this: Although the breaching party has the burden of proving mitigation, it initially discharges its burden by: (1) proving that

_____

[19] Before the Bankruptcy Court, both parties cited the Waddams treatise as the leading authority on the law of damages in Canada. TransCanada's own expert referred to it as the "leading academic treatise on damages." *See* Bankr. R., Trial Tr. 1963:22-1964:9, Mar. 11, 2008 (testimony of Professor John McCamus). The treatise is routinely cited by Canadian courts, including the Supreme Court of Canada. *See, e.g.*, *Canadian Forest Prods.*, [2004] 2 S.C.R. 74, ¶¶ 107, 108, 123, 176, 198.

the non-breaching party sold the goods or services in question at a price equal to or greater than the contract price; and (2) showing, based on reasonably obtainable information, that the non-breaching party did not have the ability (i.e., the capacity) to make the purportedly mitigating sale in the absence of the breach. At that point, in order to overcome the breaching party's showing, the non-breaching party would have to come forth with evidence that it in fact suffered a loss of profit by reason of the breach, i.e., that, absent the breach, it could have made two sales—one sale to the breaching party, and another sale to the party that ultimately purchased the goods or services in issue.[20] The non-breaching party would have to adduce evidence "peculiarly within [its] knowledge," i.e., evidence not readily available to the breaching party demonstrating that the non-breaching party could in fact have made both sales absent the breach.[21] As USGen argues, Canadian case law supports this view of the mitigation standard. *See First Ave. Mkt. Place, Inc. v. Manthos*, [1994] 100 B.C.L.R. (2d) 76, ¶ 33 (B.C.) ("While the onus of establishing mitigation is upon the wrongdoer, . . . that burden was discharged when the evidence disclosed re-rental, possibly at the same rate, *and* full or nearly full occupancy. *After that, it became necessary for the lessor to prove its damages . . . .*") (emphasis added); *cf. 1159465 Alberta Ltd. v. Adwood Mfg. Ltd.*, [2010] Alta. L.R. (5th) 237, ¶ 203 (Alta.) ("The law in mitigation may be simply stated. A defendant who alleges the plaintiff has not mitigated must

---

[20] Although neither Waddams nor any of the cited Canadian cases characterizes the non-breaching party's obligation in these precise terms, it is fair to say that, after the breaching party makes out a *prima facie* showing as to mitigation, the burden of *production* shifts to the non-breaching party to show that, despite the *prima facie* showing of mitigation, it could in fact have made both sales. Thus, although the ultimate burden of *persuasion* remains with the breaching party at all times, the non-breaching party at some point acquires the burden of *producing* evidence to prevent the breaching party from prevailing on its *prima facie* showing alone. *Cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (noting that, under the *McDonnell Douglas* standard applied in employment discrimination cases, although the burden of production shifts to the defendant after the plaintiff makes out a *prima facie* case, the "ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff").

[21] *Cf. Zurich Ins. Co. v. Ont. (Human Rights Comm'n)*, [1992] 2 S.C.R. 321, ¶ 119 (Can.) (referring to "the rule of evidence that the burden of proof should lie on the person most likely to be in possession of the relevant facts"); *McInerney v. MacDonald*, [1992] 2 S.C.R. 138, ¶ 30 (Can.) ("The burden of proof should fall on the party who is in the best position to obtain the facts.").

prove the lack of mitigation[,] *after which the burden of proof switches to the plaintiff* to show a loss notwithstanding the failure to mitigate.") (emphasis added).

The Bankruptcy Court concluded that USGen's articulation of the Canadian mitigation standard, as set forth in the Waddams treatise, was essentially correct. *See USGen*, 429 B.R. at 479-80. It reached this conclusion for two reasons: First, in the Bankruptcy Court's view, none of the cases cited by TransCanada was consistent with the broad standard it urged the Bankruptcy Court to adopt. *Id.* at 471, 474. Second, the Bankruptcy Court concluded that adoption of TransCanada's understanding of the mitigation standard would impose a virtually insurmountable burden on a breaching party:

> The Court concludes that the burden of proof that TransCanada attempts to cast on USGen is too broad and not supported . . . by the Canadian cases that TransCanada relies upon . . . . Under TransCanada's broad reading of the test, USGen would have the daunting task of exploring every conceivable action that TransCanada could have taken, no matter how remote, and then proving that TransCanada could not have taken it. The task with which TransCanada attempts to saddle USGen is insurmountable by any litigant trying to prove that a non-breaching party has mitigated its damages. . . . [U]nder TransCanada's reading of the "could have" test . . . , TransCanada can sit back and propose hypothetical actions that it could have taken almost five years earlier which, theoretically, may (or for that matter may not—depending on USGen's ability to rebut them) have enabled it to accept the three Nexen contracts absent the USGen turnback capacity. Under this view, USGen's claim for mitigation credit would fail if USGen could not both anticipate these arguments and prove that TransCanada could not have taken these actions. TransCanada's position is not supported by applicable law.

*Id.* at 471-72.

The Bankruptcy Court thus concluded that USGen had met its mitigation burden by proving that: (1) TransCanada sold the USGen turnback capacity in the fall of 2003; and (2) TransCanada thereafter had no remaining capacity available for sale because it: (a) had already sold everything it had posted, and (b) was barred from selling additional capacity without first

posting it for sale in an open season. *See id.* at 479. The Bankruptcy Court then proceeded to consider the evidence relating to TransCanada's assertion that it could have serviced the Nexen contracts even without the USGen turnback capacity by either re-aeroing the Stittsville compressor or treating the Gaz Metro bids as bids for new capacity. *See id.* at 479-80.

Having conducted its own review of the applicable law, this Court agrees with the Bankruptcy Court that USGen's interpretation of the Canadian mitigation standard is the correct one. For one thing, TransCanada has not cited, and the Court has not independently found, any Canadian case that goes so far as to say—or even reasonably suggest—that a breaching party must, with respect to mitigation, prove that the non-breaching party could not—under virtually any circumstances, however hypothetical—have entered into a subsequent contract absent the breaching party's wrong. As the Bankruptcy Court ably demonstrated, none of the cases TransCanada cites supports the broad standard it urged that Court—and now this Court—to adopt.[22] The Court agrees with the Bankruptcy Court that adoption of TransCanada's broad interpretation of the mitigation rule would make it all but impossible for a breaching party to meet its burden of proving mitigation, even where the evidence produced by the breaching party shows *both* that a mitigating sale was made *and* that, from all initial appearances, there was no opportunity or capacity for an additional sale absent the breach.

---

[22] *See Schaible Elec. Ltd. v. Melloul-Blamey Constr., Inc.*, [2004] 35 C.L.R. (3d) 141, ¶¶ 105-26 (Ont.) (standing merely for the proposition that, where the breaching party has not shown that the non-breaching party did not have the capacity to make additional sales, the breaching party retains the burden of proving that the non-breaching party could not have made both the contracted-for sale and the supposedly mitigating sale); *Crestvalley Homes Ltd. v. Krklinski*, [1996] 50 R.P.R. (2d) 283, ¶¶ 35-39 (Ont.) (standing merely for the proposition that, where it is essentially undisputed that the non-breaching party had the capacity to make additional sales, the breaching party retains the burden of proving that the non-breaching party nevertheless could not have made both the contracted-for sale and the supposedly mitigating sale); *Candlepin Mach. Parts Ltd. v. Britten*, [1991] 109 N.S.R. (2d) 366, ¶¶ 71-82 (N.S.) (holding merely that, to the extent a breaching party claims that the appropriate measure of damages is the difference between the contract price and the market price, it holds the burden of proving that there is in fact an available market for the goods in issue); *Mason & Risch Ltd. v. Christner*, [1920] 54 D.L.R. 653, 655-56 (Ont.) (holding merely that, to the extent a breaching buyer wishes to invoke the presumption that a non-breaching seller will resell the contracted-for goods in the open market, it holds the burden of proving that there is in fact an available market for those goods).

In so holding, the Court emphasizes that it does *not* mean to suggest that the breaching party need *only* show that a subsequent sale was made. As the "could have" test would seem to require, and as the Waddams treatise suggests, the breaching party must also make at least some showing, based on reasonably obtainable information, that the non-breaching party did not have the ability (i.e., the capacity) to make the purportedly mitigating sale in the absence of the breach. *See Manthos*, [1994] 100 B.C.L.R. (2d) 76, ¶ 33 ("While the onus of establishing mitigation is upon the wrongdoer, . . . that burden was discharged when the evidence disclosed re-rental, possibly at the same rate, *and full or nearly full occupancy*. After that, it became necessary for the lessor to prove its damages . . . .") (emphasis added). In other words, despite TransCanada's assertions to the contrary, the standard recognized by the Bankruptcy Court does not ignore the "could have" test; rather, it fully embraces that test insofar as it requires the breaching party to make at least some showing of the non-breaching party's lack of capacity for additional sales.

Here, USGen has shown more than just the fact that the turnback capacity was resold. It has also shown that, after the sale of the turnback capacity, TransCanada *did not have additional capacity available for sale* because it: (1) had already sold everything it had posted, and (2) was barred from selling additional capacity without first posting it for sale in an open season. *See USGen*, 429 B.R. at 479. That point sufficed for the Bankruptcy Court to hold—and for this Court to likewise hold—that the onus shifted to TransCanada to produce credible evidence that there were actions it could have taken to increase its capacity on the Mainline and thus allow it to service additional contracts absent USGen's breach.[23] That does not mean, however, that the ultimate burden of persuasion was shifted to TransCanada.

_____

[23] In oral argument before this Court, TransCanada repeatedly emphasized that, prior to trial, USGen conceded that it had the burden of proof on mitigation, and that TransCanada was therefore caught off guard when USGen later

That said, even if the Bankruptcy Court's interpretation of the Canadian mitigation standard was wrong—and the Court concludes that it was not—any error was almost certainly harmless. *See In re Travelstead*, 227 B.R. 638, 644 (D. Md. 1998) (noting that the harmless error doctrine applies to a district court's review of the decision of a bankruptcy court). This is so for several reasons.

For one, it is undisputed that, at the close of USGen's case-in-chief, TransCanada moved for judgment on partial findings, pursuant to Federal Rule of Civil Procedure 52(c), on the grounds that USGen had failed to meet its burden of proof.[24] It is also undisputed that, after the Bankruptcy Court denied that motion, TransCanada chose to put on evidence of its own. This decision barred TransCanada from limiting the focus of this appeal solely to the evidence presented in USGen's case-in-chief. *See Bituminous Constr., Inc. v. Rucker Enters.*, 816 F.2d 965, 967 (4th Cir. 1987) (noting that, if a party chooses to put on evidence following denial of a motion for judgment at the conclusion of the opposing party's case-in-chief, it waives its right to

---

took the position that the "could have" standard did not require it to fully disprove TransCanada's re-aeroing and Gaz Metro theories. While the record does indicate that USGen agreed before trial that it had the burden of proof as to mitigation, it does not appear that the parties engaged in extensive pre-trial briefing or argument regarding the precise meaning of the "could have" standard as it might apply regarding disproof of hypothetical alternatives.

In any event, the Court is unpersuaded by TransCanada's suggestion that USGen somehow turned the tables on it as to this, either at trial or during this appeal. TransCanada, for instance, argues that, had it known prior to trial that it would bear the burden of fleshing out its re-aeroing and Gaz Metro theories, it would have put on additional evidence or otherwise altered its trial strategy. This argument merits little sympathy. For many months prior to trial in the Bankruptcy Court, TransCanada was aware of USGen's mitigation theory, *viz.*, that the Nexen contracts served to mitigate the damages resulting from USGen's breach. TransCanada had every opportunity to prepare and present whatever evidence might be relevant to an appropriate defense, particularly evidence peculiarly within its knowledge with respect to the feasibility *vel non* of re-aeroing or sound reasons why the Gaz Metro bids could be treated as bids for new capacity. Indeed, TransCanada did provide some evidence in support of those theories. That it may not have provided more may have been a function of its trial strategy. On the other hand, that it may not have produced more may also reflect that additional evidence was not there to be produced.

[24] Although TransCanada appears to characterize its motion as a "motion for judgment as a matter of law" pursuant to Rule 50(a), the motion is more appropriately termed a motion for judgment on partial findings brought pursuant to Rule 52(c), since the Bankruptcy Court presided over a bench trial—as opposed to a jury trial. *See* Fed. R. Civ. P. 50(a) (referring to jury trials); Fed. R. Civ. P. 52(c) (referring to non-jury trials); *Rego v. ARC Water Treatment Co.*, 181 F.3d 396, 401 (3d Cir. 1999) ("Rule 50(a) applies in jury trials and Rule 52(c) applies in non-jury trials.").

appeal from that denial); *Ne. Drilling, Inc. v. Inner Space Servs.*, 243 F.3d 25, 37 (1st Cir. 2001) ("[B]ecause [the defendant] put on evidence following the district court's denial of the motion for judgment on partial findings, it waived its right to appeal from the denial of that motion."). In other words, given TransCanada's decision to put on evidence, it is clear that this Court may reach its decision based on *all* of the evidence in the case—including evidence presented by TransCanada—and that it is not limited to considering only the evidence put on by USGen in its case-in-chief. *See Gaffney v. Riverboat Servs.*, 451 F.3d 424, 451 n. 29 (7th Cir. 2006) (noting that, if a party chooses to put on evidence after denial of a Rule 52(c) motion, "the sufficiency of the evidence is tested on appeal by reviewing the *entire record*") (emphasis in original) (internal quotations and citations omitted).

Moreover, it is well-established that, where both parties have offered evidence, and where there is no "evidentiary tie," any improper assignment of the burden of proof is harmless since "the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof, or preponderance." *Blodgett v. Comm'r*, 394 F.3d 1030, 1039 (8th Cir. 2005); *see also Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 328-29 (4th Cir. 2001) (noting that, if the trial court improperly assigns the burden of proof on a particular issue, the error is harmless so long as the court's decision ultimately turned on the weight of all the evidence in the record and not on burden of proof rules) (internal citations omitted). In this case, while certain of the Bankruptcy Court's various factual determinations may have presented "close calls," this Court concludes that none was "clearly erroneous," and, on balance, that the sum of the evidence tilts in USGen's favor.

Finally, the Bankruptcy Court's decision reveals that it: (1) ultimately gave full consideration, over USGen's objection, to TransCanada's re-aeroing and Gaz Metro theories, *see*

*USGen*, 429 B.R. at 480-87; and (2) concluded, based on the accumulation of evidence presented by both parties, that TransCanada *could not in fact have* serviced additional contracts either by re-aeroing the Stittsville compressor or by treating the Gaz Metro bids as bids for new capacity, *see id.* at 480, 487. Absent some showing that those findings were clearly erroneous—a matter the Court addresses in more detail *infra*—reversal would not be appropriate.

The Court concludes that the Bankruptcy Court correctly applied the Canadian mitigation of damages standard, that the burden of proof on that issue was properly applied, and that, even if the Bankruptcy Court erroneously shifted the burden of proof, any error was harmless.

**B.**

The Court next considers the extent to which, if at all, the Bankruptcy Court was clearly erroneous in its factual findings in support of its conclusion that TransCanada could not have serviced the Nexen contracts but for USGen's breach.

**1.**

The Court begins with the Bankruptcy Court's factual finding that there was "surging demand" for capacity on the eastern end of the Mainline and in the U.S. northeast in late 2003 and early 2004.

The Bankruptcy Court based its finding primarily on the following observations: (1) TransCanada quickly sold the capacity it offered for sale on the Empress to Iroquois path, including the USGen turnback capacity, in the September 2003 combined open season and the October 2003 daily open season; (2) during the October 2003 daily open season, Nexen purchased all 38,800 GJ/d of capacity on the Empress to Iroquois path on the same day it was posted; (3) in February 2004, TransCanada posted and successfully sold 100,000 GJ/d of new capacity on the Empress to Iroquois path; (4) TransCanada's own notices to shippers indicated

that there was "considerable interest expressed for space on the Mainline" in September 2003, Bankr. R., TransCanada Ex. 114K, at 1, and that the capacity offered on the Empress to Iroquois path during the October 2003 daily open season had "sold out," *id.* at TransCanada Ex. 114M, at 1; (5) in September 2003, Craig Few, TransCanada's Vice President—Gas Transmission East, stated in a notice to shippers that "[t]here is no question that we are connected to strong and growing markets in eastern Canada and the U.S. northeast, which we anticipate will drive requirements for additional capacity," *id.* at TransCanada Ex. 114K, at 1; and (6) a TransCanada witness testified at trial that, in late 2003, TransCanada was "seeing increased demand for capacity [on] the eastern end of its system," *id.* at Trial Tr. 1648:18-1649:1, Mar. 10, 2008 (testimony of Thomas Robinson). Based on this evidence, the Bankruptcy Court concluded that there was "surging demand" on the eastern end of the Mainline in late 2003 and early 2004, such that, if TransCanada had offered additional available capacity for sale during that time period, it would have sold it.

TransCanada argues that the Bankruptcy Court's finding of "surging demand" in late 2003 and early 2004 was wrong to the point of being clearly erroneous. It invites the Court's attention to the following record evidence: (1) a TransCanada witness testified at trial that, in the first half of 2003, there had been "a significant reduction in contracts on the [Mainline]," and that there was capacity available throughout the system, including on the Mainline's eastern end, *see* Bankr. R., Trial Tr. 1417:5-1424:4, Mar. 7, 2008 (testimony of Dean Ferguson);[25] (2) a second TransCanada witness testified at trial that, prior to December 2003, projected demand was insufficient to justify re-aeroing the Stittsville compressor, *see id.* at Trial Tr. 1600:12-1605:21,

_____

[25] The same witness also testified, however, that the eastern end of the Mainline "had a higher utilization rate, [a] higher contract rate," as compared to the rest of the system, and that the available capacity on the eastern end was "proportionately less" than on the western end. Bankr. R., Trial Tr. 1423:5-9, Mar. 7, 2008 (testimony of Dean Ferguson).

1612:8-1617:4, Mar. 10, 2008 (testimony of Thomas Robinson);[26] (3) during the September 2003 combined open season, there were no bids for *new* capacity—as opposed to existing capacity—on the Empress to Iroquois path; (4) during the October 2003 daily open season, Nexen was the only bidder for the 38,800 GJ/d of capacity posted on the Empress to Iroquois path;[27] and (5) at the time TransCanada realized that it had erroneously posted an additional 38,800 GJ/d of capacity along the Empress to Iroquois path during the October 2003 existing capacity open season, there were no bidders for that capacity.[28] On the basis of the foregoing, TransCanada argues that the Bankruptcy Court's finding of "surging demand" in late 2003 and early 2004 "has no support in the record."

To conclude that the Bankruptcy Court clearly erred in finding that there was "surging demand" on the eastern end of the Mainline in late 2003 and early 2004, the Court must be "left with [a] *definite and firm conviction* that a mistake has been committed." *Bessemer City*, 470 U.S. at 573 (emphasis added). Indeed, under the clearly erroneous standard, the "reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the [fact-finding] role of the lower court." *Id.* Based on this standard of review, and the record evidence, the Court concludes that the Bankruptcy Court's factual determination on this particular issue was not clearly erroneous. While it is true that some evidence points away from a finding that demand for capacity on the Mainline was "surging" in the latter third of 2003, other substantial evidence

---

[26] Although this witness did testify that there were no "firm commitments" for future demand on the eastern end of the Mainline in early to mid-2003, he also testified that "[t]here was significant market interest being expressed by a number of shippers." Bankr. R., Trial Tr. 1612:12-21, Mar. 10, 2008 (testimony of Thomas Robinson).

[27] While this statement is technically accurate, it fails to give appropriate recognition to the fact that Nexen purchased all 38,800 GJ/d of capacity *on the very same day that it was posted*.

[28] Although this statement, too, is technically accurate, TransCanada overlooks the fact that it realized its error—and then issued a notice amending the available capacity to zero—*a mere three days* after the seven-day October 2003 existing capacity open season began. *See* Bankr. R., TransCanada Ex. 114M, at 1 (noting that the October 2003 existing capacity open season would run for seven days—from October 20, 2003 until October 27, 2003).

shows that there was "significant market interest" in capacity during that period, and that

TransCanada had little trouble selling the capacity it offered for sale on the Empress to Iroquois

path in the September 2003 combined open season and the October 2003 daily open season. In

short, the Court is not "left with a definite and firm conviction that a mistake has been

committed" with respect to the Bankruptcy Court's finding that the demand for capacity on the

eastern end of the Mainline in late 2003 and early 2004 was robust, which is to say, "surging."

**2.**

TransCanada also challenges the Bankruptcy Court's use of TransCanada's bid-ranking

procedures to determine which contracts were the last awarded in late 2003 and could not have

been entered into absent the USGen turnback capacity, and which therefore should constitute

mitigation of TransCanada's damages resulting from the breach. The Bankruptcy Court reasoned

as follows:

> The bid-ranking procedures in the TAP used by TransCanada to rank bids and
> allocate posted capacity . . . provide a reasonable and objective method to
> determine which of the contracts awarded by TransCanada in the [September
> 2003 combined open season] could not have been entered into by TransCanada
> absent the USGen turnback capacity, and thus should constitute mitigation. As
> explained [previously], the bid-ranking procedures are mandated by the TAP and
> are designed to maximize revenue over the long term to TransCanada. Further,
> TransCanada utilizes the bid-ranking procedures in the ordinary course of
> business to evaluate bids, allocate capacity, and award contracts. Finally, utilizing
> the bid-ranking procedures gives mitigation credit to those contracts that are the
> least valuable to TransCanada under the TAP-mandated analysis, and therefore is
> consistent with mitigation principles.

> The bid-ranking procedures require TransCanada to rank all the bids it receives
> based on a formula set forth in the TAP. Pursuant to this ranking, TransCanada
> awards capacity first to the highest ranked bidder. The next highest ranked bidder
> then is awarded capacity, and the process continues until all the available capacity
> is exhausted or all bids are filled. The bid-ranking procedures are critical to the
> analysis herein because they show that TransCanada awards its bids and allocates
> capacity in sequence. Consequently, this feature provides a clear picture of which

contracts were awarded last and thus could not have been entered into by TransCanada absent the USGen turnback capacity.

*USGen*, 429 B.R. at 468-69.

Applying the TAP-mandated bid-ranking procedures, the Bankruptcy Court determined that the Nexen contracts were, as viewed by TransCanada itself, the least valuable to TransCanada and thus plausibly represented the last awarded on the Empress to Iroquois path during the fall of 2003. The Bankruptcy Court consequently used the value of the Nexen contracts—some $58.8 million[29]—to calculate USGen's mitigation credit.

On appeal, TransCanada argues that the Bankruptcy Court's use of TransCanada's bid-ranking procedures was erroneous for at least three reasons. First, it argues that the TAP procedures "have nothing to do with mitigation," and are merely used to "ensure fair and equitable treatment" of all shippers bidding for TransCanada's services. Second, TransCanada maintains that the results produced by application of the TAP procedures do not necessarily mirror the revenue that TransCanada actually receives from its contracts, presumably because the amount of revenue ultimately realized will depend upon certain factors that cannot be determined at the time of contract award, such as whether shippers later decide to renew their contracts for longer periods of time.[30] For example, TransCanada notes that the Gaz Metro contracts, which the bid-ranking procedures ranked highly during the September 2003 combined open season,

---

[29] The two Nexen contracts sold during the September 2003 combined open season realized revenue of $15,891,255.50. *USGen*, 429 B.R. at 454. The Nexen contract sold during the October 2003 daily open season realized revenue of $42,939,882.20. *Id.* at 455. Thus, the combined value of the three Nexen contracts was $58,831,137.70.

[30] As the Bankruptcy Court noted, "[i]n a typical [Firm Transportation service] contract, [a] . . . shipper has the right, after providing notice to TransCanada, to renew the contract indefinitely in one-year increments. Because of this renewal right, TransCanada must ensure that capacity offered as [Firm Transportation service] is available indefinitely." *USGen*, 429 B.R. at 444.

ultimately generated far less revenue than the lower-ranked Nexen contracts.[31] Third, and finally, TransCanada argues that the use of the bid-ranking procedures to determine which contracts must be credited as mitigation is contrary to Canadian law, which permits a non-breaching party to place its own business and financial interests ahead of those of a breaching party. *See Forshaw v. Aluminex Extrusions Ltd.*, [1989] 39 B.C.L.R. (2d) 140, ¶¶16-17 (B.C.) (stating that the duty to mitigate is not a duty to act in the breaching party's interests, but rather to act as a "reasonable person" would act "*in his own interests*") (emphasis added).

The Court is convinced by none of TransCanada's arguments. While a stated purpose of the TAP may be to "ensure fair and equitable treatment to all shippers," *see* Bankr. R., TransCanada Ex. 81, at 1, it is equally true that the bid-ranking procedures are designed to maximize TransCanada's revenue over the long term.[32] Moreover, because the procedures are approved in advance by the NEB, TransCanada cannot deviate from them—whether it wishes to or not.[33] Second, while it also may be true that the bid-ranking procedures do not reflect the revenue that TransCanada actually receives, it appears beyond dispute that those procedures do determine *which bids TransCanada actually accepts* based on its perception of their value. Thus, even if the Nexen contracts ultimately turned out to be far more valuable than the higher-ranked Gaz Metro contracts, the Court cannot ignore the reality that, at the time of bidding, TransCanada deemed the Nexen contracts the *least* valuable and thus could not—and would

---

[31] The Bankruptcy Court's opinion, the parties' briefs, and the record are somewhat unclear on this point. It appears, however, that the September 2003 Nexen contracts—which were ranked below the Gaz Metro contracts at the time of bidding in part because of their short commitment period (17 months)—were ultimately renewed, resulting in greater total revenue than initially anticipated.

[32] *See supra* note 8.

[33] TransCanada does not deny that the TAP must be approved by the NEB and that it is therefore bound to follow the procedures therein, including the bid-ranking procedures.

not—have accepted them absent the additional capacity made available by USGen's breach.[34]

Finally, TransCanada misapplies the principle of Canadian law that a non-breaching party need not act in the best interests of the breaching party. While it is undeniable that, subsequent to the breach, TransCanada was not obliged to act in USGen's best interests, it is also beyond question that its duty to act as a reasonable person would act in his own best interests does not permit TransCanada to engage in an *ex post facto* rearrangement of the facts in order to produce the mitigation credit most favorable to itself.

Simply put, the Bankruptcy Court's task with respect to the issue of mitigation was to determine which contracts TransCanada could not have obtained absent USGen's breach. *See Dawson*, [1958] 12 D.L.R. (2d) at 10 (noting that, with respect to mitigation, the question is whether "the interest acquired by the damaged person is something he could not have been able to obtain if the contract had been carried out"). To complete that task, the Bankruptcy Court applied the very bid-ranking procedures TransCanada was required to apply, apart from the fact of the USGen breach. In so doing, the Bankruptcy Court in effect concluded that: (1) if USGen had *not* breached, TransCanada would only have had 100,000 GJ/d of capacity available for sale in the September 2003 combined open season so that, pursuant to its bid-ranking procedures, it would have had to turn away the two Nexen bids received during that period because those bids were ranked lower than all others and would have resulted in a total award in excess of the

---

[34] TransCanada appears to argue that it should be able to: ignore its bid-ranking procedures; assemble all of the contracts awarded during the relevant period; sort the contracts from the most to the least valuable based on revenue ultimately realized; and then hold up as mitigation those contracts that would result in the smallest mitigation credit. This ignores the more fundamental inquiry, however, namely: Of the contracts consummated, which are those that TransCanada could not have entered into absent USGen's breach? *See Dawson*, [1958] 12 D.L.R. (2d) at 10 (noting that, with respect to mitigation, the question is whether "the interest acquired by the damaged person is something he could not have been able to obtain if the contract had been carried out"). In answering this question, it hardly seems inappropriate to embrace TransCanada's own contemporaneous view of which contracts would likely provide it with the most revenue, and which with the least, and which, therefore, it was disposed to award first and which last.

100,000 GJ/d of capacity available; and (2) because USGen did breach, TransCanada in fact had 150,000 GJ/d of available capacity in the fall of 2003, as a result of which it was able to accommodate not only the two Nexen bids received in the September 2003 combined open season, but also the third Nexen bid received in the October 2003 daily open season. Because the Nexen contracts were contracts that TransCanada could not have serviced absent USGen's breach, in combination they constitute mitigation of the damages resulting from that breach. The Court finds no error—much less "clear error"—in these conclusions, and further concludes *de novo* that the Bankruptcy Court's application of Canadian mitigation principles on this point was correct.

## 3.

TransCanada next challenges the Bankruptcy Court's rejection of its re-aeroing theory, i.e., that, absent USGen's breach, it "could have" satisfied both the USGen contract and the Nexen contracts by re-aeroing the Stittsville compressor, thereby increasing capacity on the Mainline. The Bankruptcy Court rejected this theory for three reasons—two factual and one legal. First, the Bankruptcy Court concluded, as a factual matter, that TransCanada's re-aeroing theory was not credible because, despite surging demand in late 2003 and early 2004, it did not in fact undertake re-aeroing during that time period. Second, also as a matter of fact, the Bankruptcy Court found that TransCanada could not have sold additional capacity theoretically available through re-aeroing because it did not post such capacity for sale in the fall of 2003, and there was a regulatory requirement prohibiting TransCanada from selling capacity on the Mainline without first posting the capacity for sale in an open season. Third, and finally, the Bankruptcy Court concluded as a matter of law that, assuming TransCanada somehow "could have" and "would have" re-aeroed the Stittsville compressor to increase capacity, the fact that it

did not do so, and did not post such capacity for sale in late 2003, would have amounted to a failure to fulfill its duty to mitigate its damages resulting from USGen's breach, which, in consequence, may well have precluded it from recovering any damages it could have mitigated through re-aeroing.

Although TransCanada takes several exceptions to these findings, its principal argument is that they conflict with the "could have" test because they focus on what TransCanada "actually did," as opposed to what it "could have" done. The Court is unmoved. First, as USGen notes, what TransCanada "actually did" or did not do in the fall of 2003 is certainly probative of—and thus relevant to—what it "could have" done. After all, if TransCanada could in fact have re-aeroed the Stittsville compressor without much trouble in the fall of 2003, it presumably would have done so, given the high demand for capacity on the eastern end of the Mainline during that time period. Second, despite TransCanada's suggestion to the contrary, the Bankruptcy Court found as a matter of fact that TransCanada *could not have* increased its capacity through re-aeroing in the fall of 2003—both because TransCanada's evidence was deemed less than credible *and* because TransCanada did not post additional capacity for sale during that period. Third, and finally, TransCanada does not adequately address the Bankruptcy Court's conclusion that, even if TransCanada could have increased capacity by re-aeroing the Stittsville compressor, its failure to do so, given "surging demand" on the eastern end of the Mainline, would have amounted to a failure to mitigate its damages, thus barring much of its recovery. It is beyond dispute that Canadian law imposes a duty to mitigate on a non-breaching party. *See, e.g.*, *Canadian Forest Prods.*, [2004] 2 S.C.R. 74, ¶ 106 (noting that, under Canadian law, a non-breaching party has a duty to "take reasonable steps to mitigate its loss"). In view of that, and given the existence of "surging demand" on the eastern end of the Mainline during the relevant

time period, there is firm foundation for the Bankruptcy Court's conclusion that a decision *not* to re-aero—if indeed re-aeroing was really possible—would have constituted a failure to mitigate on TransCanada's part.

To be sure, TransCanada cites some evidence—primarily witness testimony—suggesting that, without much difficulty, it could have re-aeroed the Stittsville compressor in the fall of 2003. *See* Bankr. R., Trial Tr. 1600:12-1602:9, 1642:5-1645:16, Mar. 10, 2008 (testimony of Thomas Robinson); *id.* at Trial Tr. 990:3-991:15, Mar. 6, 2008 (testimony of Peter Milne). However, aside from the fact that the Bankruptcy Court, as trier of fact, was in a position to reject or minimize any testimony it deemed not credible,[35] there was ample evidence showing that: (1) considerable demand for capacity existed as to the eastern end of the Mainline in the fall of 2003, yet TransCanada still did not re-aero at that time; (2) pursuant to the NEB-approved TAP, TransCanada could not have sold capacity on the Mainline without first posting the capacity for sale in an open season; and (3) TransCanada did not in fact post additional capacity for sale—capacity that it theoretically could have made available through re-aeroing—during the relevant time period. Against this background, the Court is not "left with [a] definite and firm conviction," *see Bessemer City*, 470 U.S. at 573, that the Bankruptcy Court erred when it found that TransCanada could not have made additional sales through re-aeroing.

---

[35] *See, e.g.*, *Guy v. City of San Diego*, 608 F.3d 582, 588 (9th Cir. 2010) ("[I]t has long been held that a jury may properly refuse to credit even uncontradicted testimony."); *United States v. Brown*, 742 F.2d 363, 366 n.2 (7th Cir. 1984) ("We also note that [the defendant's] reliance on the fact that his testimony was uncontradicted is inapposite. The trier of fact is not required to credit the testimony of any interested witness, even if that testimony is uncontradicted.").

**4.**

TransCanada next challenges the Bankruptcy Court's finding that TransCanada could not have freed up additional capacity by treating the Gaz Metro bids as bids for new capacity. Here, too, TransCanada fails to demonstrate that the Bankruptcy Court's finding was clearly erroneous.

The Bankruptcy Court based its rejection of TransCanada's Gaz Metro theory not only on the testimony of USGen's expert, who opined that the Gaz Metro bids constituted bids for existing—as opposed to new—capacity, *see* Bankr. R., Trial Tr. 1002:2-9, Mar. 6, 2008 (testimony of Peter Milne), but also on one of TransCanada's own documents, which suggested that there was but a single bid for new capacity during the September 2003 combined open season, and that that bid plainly was not a Gaz Metro bid, *see* Bankr. R., TransCanada Ex. 43, at 2-3. The Bankruptcy Court noted that no witness testified that the Gaz Metro bids included the requisite new capacity documentation[36] or that they otherwise qualified as bids for new capacity. Ultimately, the Bankruptcy Court concluded that "the Gaz Metro bids did not qualify as bids for new capacity and that TransCanada *could not have* treated the Gaz Metro bids as bids for new capacity in the July-September 2003 open season." *USGen*, 429 B.R. at 487 (emphasis added).

As with its re-aeroing theory, TransCanada maintains that the Bankruptcy Court's finding with respect to the Gaz Metro bids erroneously relied on what TransCanada "actually did," as opposed to what it "could have" done, citing the testimony of its Vice President, Dean Ferguson,

---

[36] Pursuant to the NEB-approved TAP, notice of a new capacity open season must request that:

> service applicants provide to TransCanada with their bid form all applicable supporting documentation set out in Part 3 of the National Energy Board's Guidelines for Filing Requirements determined by TransCanada to be necessary for submission to the NEB in support of TransCanada's facilities application pursuant to Part III of the NEB Act and which evidence supports the service applicant's need for transportation service in the time frame contemplated in the service applicant's bid form.

Bankr. R., TransCanada Ex. 81, at 7-8. The Bankruptcy Court found as a fact that the record did not establish that Gaz Metro had submitted all of the documentation required as part of a bid for new capacity.

who stated at trial that TransCanada "could have added . . . new capacity" in order to accommodate the Gaz Metro contracts. *See* Bankr. R., Trial Tr. 1455:9-1456:9, Mar. 7, 2008 (testimony of Dean Ferguson).

As before, however, faced with at best competing evidence, the Bankruptcy Court committed no clear error in reaching a conclusion that did not favor TransCanada. The Bankruptcy court relied on: (1) expert testimony that the Gaz Metro bids did not qualify as bids for new capacity; (2) a document suggesting that there was only one bid for new capacity in September 2003, and that the single new capacity bid was not submitted by Gaz Metro; and (3) the absence of any evidence showing that Gaz Metro had submitted certain new capacity documentation required by the TAP. Again, the Court is not "left with a definite and firm conviction" that the Bankruptcy Court erred when it found that TransCanada could not have made additional sales by treating the Gaz Metro bids as bids for new capacity.

## C.

TransCanada further submits that, if USGen is entitled to any mitigation credit at all, the credit should be limited to an amount reflecting a very short distance along the Mainline, *viz.*, between the beginning of the "Triangle" and Iroquois, a distance of approximately 430 kilometers. *See* Bankr. R., Trial Tr. 1755:8-1758:21, Mar. 10, 2008 (testimony of Robert Whitmore).

TransCanada maintains that, both at the time of USGen's breach and throughout the remainder of the term of its contract with USGen, TransCanada had substantial excess capacity on the western segments of the Mainline—from Empress in the far west to the Triangle, the loop of interconnecting pipe near the eastern end of the Mainline that includes the Stittsville compressor and Iroquois. TransCanada claims that the "bottleneck" on the Mainline occurred

near the Stittsville compressor, which is a mere short distance from the end of the Empress to Iroquois path, and that—because tolls on the Mainline are primarily distance-based—USGen should receive mitigation credit, if any at all, only for the amount of the Nexen contracts attributable to the short distance along the far eastern end of the Mainline. In other words, TransCanada argues that, because the capacity bottleneck that might have prevented it from awarding additional contracts did not begin until a point near the very end of the Mainline, any mitigation credit awarded to USGen should be limited to the revenue from the Nexen contracts attributable to the short distance between the bottleneck and the end of the line.

The Bankruptcy Court rejected TransCanada's limited mitigation theory, after concluding that "[n]othing in the record supports the notion that Nexen Marketing would have accepted a contract in September or October 2003 only from Empress to [the Triangle]. Indeed, the record establishes that such a notion is factually unsupportable." *USGen*, 429 B.R. at 487. Specifically, the Bankruptcy Court found no evidence in the record suggesting that Nexen would have accepted a contract for delivery at *any* location short of its contracted-for delivery point east of Iroquois. The Bankruptcy Court also concluded that, were it to adopt TransCanada's limited mitigation theory, TransCanada would, contrary to Canadian law,[37] end up in a better position than it would have been in absent USGen's breach, since it would receive the full benefit of its contract with USGen *and* all but a small portion of certain contracts (the Nexen contracts) it could not have obtained absent the breach.

On appeal, TransCanada argues that the Bankruptcy Court's decision to award full mitigation credit for the Nexen contracts resulted in a windfall for USGen, since, "if

---

[37] *See, e.g., Karas v. Rowlett*, [1944] S.C.R. 1, ¶ 8 (Can.) ("It is well settled that the person who has suffered from [a breach of contract] is entitled, so far as money can do it, to be placed in as good a position as if the contract had been performed.").

TransCanada needed any of USGen's turnback capacity to enter into the Nexen contracts[,] it was only at the portion of the Mainline that was constrained." The argument fails to persuade. TransCanada may be correct in its assertion that its capacity constraints were in some measure attributable to a bottleneck spanning only a small segment of the Mainline. However, assuming that to be true, and taking into account the Bankruptcy Court's other findings, the fact remains that—absent the USGen turnback capacity—TransCanada's capacity constraints would have prevented it from awarding the Nexen contracts *at all*. In other words, whether the technical problem that gave rise to constrained capacity is associated with a large or small percentage of the Mainline is irrelevant. The relevant inquiry is this: Would the capacity constraints have prevented TransCanada from awarding the Nexen contracts absent the USGen turnback capacity? The Bankruptcy Court answered that question in the affirmative, making the distance between the bottleneck and Iroquois beside the point.[38] The Court finds no "clear error" in that conclusion.

### D.

TransCanada maintains that the Bankruptcy Court also erred when it ruled that the value of TransCanada's claim should be discounted to the petition date. The Court reviews this conclusion of law *de novo*.

---

[38] As USGen notes, the two real estate cases that TransCanada cites on appeal do not support its position because, in both of those cases, the court found that, unlike in the present case, the non-breaching party in fact could have entered into the supposedly mitigating contract(s)—or at least some considerable portion thereof—even in the absence of the breach. In each case the court nevertheless went on to award partial mitigation credit to account for a small percentage of revenue that the non-breaching party likely would not have been able to earn absent the breach. *See Delray Prof'l Arts, Inc. v. Isaac*, [2001] CarswellOnt 4649, ¶¶ 55-60 (Ont.) (awarding partial mitigation credit to account for the fact that a non-breaching landlord benefited from a breaching tenant's leasehold improvements); *Schluessel v. Maier*, [2001] 85 B.C.L.R. (3d) 239, ¶¶ 172-80 (B.C.) (awarding 10-percent partial mitigation credit to account for certain work a non-breaching real estate developer could not have performed in the absence of the defendants' breach). Here, however, there is no indication that, absent USGen's breach, TransCanada could have serviced some subset of the Nexen contracts. All available evidence suggests that the Nexen bids were an all-or-nothing proposition, and that TransCanada would have had to reject those bids absent the USGen turnback capacity.

-38-

As the Bankruptcy Court noted in its opinion, the plain language of the U.S. Bankruptcy Code requires it to value the amount of a claim arising from a rejected contract "as of the date of the filing of the petition." 11 U.S.C. § 502(b) ("[T]he court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition . . . ."); *see also In re CF&I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1300 (10th Cir. 1998) (citing 11 U.S.C. § 502(b)) ("To insure the relative equality of payment between claims that mature in the future and claims that can be paid on the date of bankruptcy, the Bankruptcy Code mandates that all claims for future payment must be reduced to present value."). Citing this rule, the Bankruptcy Court concluded that it was obliged to discount not only the value of the payments TransCanada would have received if its contract with USGen had not been rejected, but also the payments that Nexen made to TransCanada during the same period that serve as mitigation. *See USGen*, 429 B.R. at 491. In other words, the Bankruptcy Court concluded that it was required to discount the net amount owed TransCanada to the petition date.

TransCanada argues on appeal, as it did in the Bankruptcy Court, that discounting to the petition date is inappropriate in cases like the present one, where the debtor turns out to be solvent and unsecured creditors' claims are paid in full. This is so, TransCanada says, because the rationale behind discounting claims to the petition date—i.e., compliance with 11 U.S.C. § 502(b)(2)'s prohibition against the payment of post-petition interest—does not apply where creditors are in fact paid in full with interest. TransCanada cites *In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006), in which the Third Circuit essentially held that § 502(b) does not require discounting in every case. *See id.* at 598 ("Viewing the Bankruptcy Code holistically, we

cannot say that the language of 11 U.S.C. § 502(b) clearly and unambiguously requires the same discounting to present value as is required in other sections of the Code.").

The Court has several problems with TransCanada's argument. First, while TransCanada cites authority suggesting that § 502(b) does not necessarily require discounting in every circumstance, it cites no authority for the proposition that a Bankruptcy Court is necessarily prohibited from discounting to the petition date whenever a debtor turns out to be solvent. Second, TransCanada interprets the ruling of *Oakwood Homes* too broadly. There, the Third Circuit expressly limited its holding to cases, unlike the present one, in which interest on a claim has already been expressly *dis*allowed. *See Oakwood Homes*, 449 F.3d at 598.[39] Third, and finally, TransCanada fails to acknowledge that, because USGen is a solvent debtor, TransCanada will in fact receive interest on its claim. Thus, as the Bankruptcy Court noted, "failing to discount the payments due under the contract—at least those from September 5, 2003 through October 2006—would result in TransCanada being paid interest from and after the rejection date on undiscounted future payments. That result is at odds with usual present value concepts." *USGen*, 429 B.R. at 491-92.

The Court concludes that the Bankruptcy Court acted properly in discounting the value of TransCanada's claim to the petition date.

### E.

As a final argument, TransCanada maintains that the Bankruptcy Court erred when it determined that TransCanada's claim should be converted to U.S. dollars using the exchange rate

---

[39] The *Oakwood Homes* court wrote: "We do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value, but instead that the statute does not clearly and unambiguously *require* it for all claims evaluated under § 502." *Oakwood Homes*, 449 F.3d at 598 (emphasis in original).

in effect on the petition date—as opposed to the rate in effect at the time of entry of final judgment. The Court reviews this proposition of law *de novo*.

Title 11, § 502(b) of the United States Code requires the Bankruptcy Court to value the amount of a claim arising from a rejected contract "in lawful currency of the United States *as of the date of the filing of the petition*." 11 U.S.C. § 502(b) (emphasis added). In this case, the Bankruptcy Court converted TransCanada's claim from Canadian dollars to U.S. dollars at the rate in effect on the petition date, citing authority for that conclusion. *See In re Global Power Equip. Group, Inc.*, Case No. 06-11045, 2008 Bankr. LEXIS 455, at *12 (Bankr. Del. Feb. 14, 2008) ("[Section 502(b)'s] plain language requires the Court to determine the allowed amount of a claim, which is denominated in foreign currency, in United States currency by using the exchange rate that prevails on the petition date."); *see also Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir. 1999) (noting that, under U.S. bankruptcy law, claims in a foreign currency are determined by converting them to U.S. dollars as of the date of the filing of the petition).

TransCanada takes issue with the Bankruptcy Court's conclusion, citing *Zimmermann v. Sutherland*, 274 U.S. 253 (1927), an 84-year-old case in which the U.S. Supreme Court effectively established the "judgment day rule," which holds that, when a contractual obligation is payable in a foreign country in that country's currency, the amount owed should be converted at the rate in effect on the date of judgment. *See Zimmermann*, 274 U.S. at 255-56; *see also In re Good Hope Chem. Corp.*, 747 F.2d 806, 810 (1st Cir. 1984). TransCanada notes that at least one court has recognized the judgment day rule in the bankruptcy context. *See Good Hope*, 747 F.2d at 810-12.

As USGen notes, however, no authority TransCanada cites has applied the judgment day rule following adoption of the modern Bankruptcy Code, which was promulgated in 1978 and which inaugurated § 502(b). Indeed, *Good Hope*, the only bankruptcy case TransCanada cites in support of its position that the judgment day rule should apply, was decided under the Bankruptcy Act of 1898. *See Good Hope*, 747 F.2d at 807.

Because the plain language of § 502(b) states that any claim must be converted to U.S. currency at the exchange rate in effect on the petition date, and because TransCanada has cited no authority decided in the § 502(b) context that suggests otherwise, the Court finds that the Bankruptcy Court correctly determined that TransCanada's claim should be converted to U.S. dollars using the exchange rate in effect on the petition date.

## V.

Finally, the Court considers USGen's argument that TransCanada is not entitled to any damages at all—not even the $4,643,700 the Bankruptcy Court ultimately awarded—because TransCanada's regulatory system fully insulates it from the consequences of USGen's breach. The Court treats this issue as a question of law, which it reviews *de novo*.

The Court briefly revisits the process by which TransCanada determines the tolls it charges its shipper-customers for service on the Mainline. As discussed in footnote 3, *supra*, TransCanada's NEB-approved tolls are essentially determined via a two-step process. In the first step, estimates of TransCanada's prudently incurred costs are determined and then an amount representing a reasonable rate of return for TransCanada's investors is added; the sum of these two figures constitutes TransCanada's annual revenue requirement. In the second step, TransCanada's revenue requirement is divided by its "allocation units," which represent the total of the known GJ/d shipping units in all of TransCanada's contracts in existence at the time of

NEB approval of TransCanada's annual tolls. From this calculation, tolls for all receipt and delivery points on the Mainline are derived for the upcoming year.

Because the cost and revenue estimates that TransCanada submits in its annual toll applications are just that—estimates—costs actually incurred and revenues actually earned sometimes vary—and materially so—from TransCanada's projections. Recognizing this, TransCanada's regulatory regime calls for the maintenance of so-called "deferral accounts," into which TransCanada deposits amounts representing either deficient revenue (from, say, shipper defaults) or surplus revenue (from, say, amounts recovered as the result of litigation). Deferral account balances are carried forward from one year to the next and, *if* approved by the NEB, may result in higher or lower tolls than would otherwise result.

USGen argues that, given this regulatory scheme, TransCanada was fully insulated—through its deferral account carry-overs—from the effects of USGen's breach and, therefore, should not be entitled to any recovery at all.[40] In support of this position, USGen points to the *Canadian Forest Products* case, in which the Supreme Court of Canada concluded that the Province of British Columbia ("the Province") could not recover damages resulting from a negligently-destroyed timber harvest because the applicable regulatory regime fully insulated the Province from loss. *See Canadian Forest Prods.*, [2004] 2 S.C.R. 74, ¶ 30. In that case, the Province, which issues timber harvesting licenses to loggers, had sued a licensee to recover lost revenue resulting from a forest fire—caused by the licensee—that burned some 1,491 hectares (approximately 3,684 acres) of land. *See id.* at ¶ 1. Under the regulatory regime's loss-spreading system, the revenue lost as a result of the fire was automatically reflected—pursuant to quarterly rate adjustments—in higher rates charged for timber harvesting in areas unaffected by the fire.

---

[40] It is unclear from the record precisely how much TransCanada has been able to recover, if there has been any recovery at all, in higher tolls as a result of deferral account carry-overs containing losses from USGen's breach.

*See id.* at ¶¶ 21-28. This scheme all but guaranteed that, notwithstanding the fire, the Province would meet its revenue target. *See id.* at ¶ 28 ("[T]he regulatory regime was a loss-spreading system that distributed . . . gains and . . . losses amongst the forest licensees throughout the region in such a way that the Province did not, and could not, suffer a revenue loss . . . ."). Hence, the Canadian Supreme Court held that the Province could not collect further damages from the licensee. *See id.* at ¶ 30.

USGen urges the Court to apply the same principle here and deny TransCanada any recovery at all for USGen's breach. According to USGen, the present case is virtually indistinguishable from *Canadian Forest Products*, since TransCanada can, through deferral accounts, pass the effects of lost revenue from defaulting shippers on to its other customers in the form of higher tolls in the coming years. In USGen's words, "it is TransCanada's shippers, not TransCanada, who bear the brunt or receive the benefit of changes in TransCanada's revenues, just as the loggers in *Canadian Forest Products* bore the impact of any unforeseen events like forest fires." Appellee's Br. 46 [Paper No. 22].

USGen made this argument before the Bankruptcy Court, but the Bankruptcy Court found that *Canadian Forest Products* was distinguishable, for at least two important reasons. First, it concluded that the regulatory system at issue here, unlike that in *Canadian Forest Products*, is not truly revenue neutral, since it merely provides TransCanada with the *opportunity*—without any guarantees whatsoever—to recover lost revenue in future years. *See USGen*, 429 B.R. at 498. Indeed, any request to recoup lost revenue in future tolls is subject to approval by the NEB, and such approval is given, if at all, only after review by "numerous shippers, shipper organizations, and others who are interested in minimizing the cost to ship gas on the Mainline." *Id.* Second, the Bankruptcy Court found that, unlike the plaintiff in *Canadian*

*Forest Products*, TransCanada has an NEB-imposed duty of prudence that in effect requires it to pursue defaulting shippers, and that any failure to do so might well subject it to NEB review through a so-called "review and variance proceeding." *See id.* at 499-500. Given these distinguishing factors, the Bankruptcy Court concluded that the basic rationale of *Canadian Forest Products* does not apply here. *See id.* at 498.

This Court concludes that the Bankruptcy Court was correct in distinguishing *Canadian Forest Products* and determining that that decision does not control the present case. *Canadian Forest Products* was clearly limited to the unique factual scenario at issue there—namely, a regulatory scheme that *completely* insulated a government entity from loss, one that placed no duty on that entity to pursue tortious or breaching licensees. Moreover, in the present case, it may well be that the benefit of any amounts ultimately recovered by TransCanada in this litigation will be passed on to shippers in the form of lower rates in future years—meaning that, unlike in *Canadian Forest Products*, any success TransCanada might have in recovering lost amounts is unlikely to result in any sort of "double recovery." Further, the Court notes that a more recent decision of the Supreme Court of Canada, *Kingstreet Investments Ltd. v. New Brunswick*, suggests that *Canadian Forest Products* should not be read to permit the broad availability of the "passing on" defense, since such a defense "is inconsistent with the basic principles of restitutionary law." [2007] 1 S.C.R. 3, ¶¶ 42-51 (Can.).

USGen's argument that TransCanada's recovery is completely barred by reason of the *Canadian Forest Products* decision is rejected.

## VI.

For the foregoing reasons, the decision of the Bankruptcy Court is **AFFIRMED** in its entirety and the case will be **CLOSED**. A separate Order will **ISSUE**.

_____/s/_____
**PETER J. MESSITTE**

**August 30, 2011**               **UNITED STATES DISTRICT JUDGE**